John W. Sheller (SBN: 67519)
David C. Hunter (SBN: 208155)
HINSHAW & CULBERTSON LLP
11601 Wilshire Blvd., Suite 800
Los Angeles, CA 90025
T: 310-909-8000
F: 310-909-8001

Attorneys for
Specially Appearing Defendant
DAVID SMITH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

CV08-06531 PSG (FFMx)

KIRBY MORGAN INC., a California Corporation,

Claimant,

vs.

HYDROSPACE LTD., A Scottish Limited Liability Corporation; DAVID SMITH, an individual resident of Scotland;

Respondents.

Case No. _____

**DECLARATION OF DAVID SMITH IN SUPPORT OF PETITION TO QUASH CLAIM IN ARBITRATION FOR LACK OF PERSONAL JURISDICTION**

**AAA Arbitration Filed: September 15, 2008**
**Arbitration Hearing Date:  None Set**

**No. 55 155 T 00368 08**
**[International Centre for Dispute Resolution]**

1.    I, David Smith, am a citizen of the United Kingdom and resident of Aberdeenshire, Scotland.  I make the following statements based upon my own personal knowledge and, if called to testify, I could and would testify as follows:

2.    I engaged Hinshaw & Culbertson LLP to make a special appearance on my behalf for the sole purpose of contesting in personam jurisdiction over me in California.

1        3.    I am acting Director of Hydrospace Ltd, A Limited Liability Corporation formed

2    under the law of Scotland.

3        4.    On September 4, 2008 Kirby Morgan filed the subject Claim in Arbitration with the

4    American Arbitration Association ("AAA").  Please see a true and correct copy of the Claim in

5    Arbitration, <u>which Hydrospace received in Scotland</u>, attached hereto as, **Exhibit A.**

6        5.    Kirby Morgan's claim stems from an alleged breach of contract by Hydrospace.  I

7    executed the Dealer Agreement on behalf of Hydrospace on June 23, 2003.  Please see a true and

8    correct copy of this Dealer Agreement attached hereto as **Exhibit B.**

9        6.    While Kirby Morgan named me in this Claim, I did not sign the Dealer Agreement in

10    my individual capacity.

11        7.    I have never lived in California.

12        8.    I have never owned real or personal property in California.

13        9.    I have never had an agent for service of process in California.

14        10.    I have not maintained a mailing address or telephone listing in California.

15        11.    I have not opened a bank account in California.

16        12.    I have not personally transacted business in California.

17        13.    If I were required to arbitrate this dispute or appear in the California Courts I would

18    be subject to substantial, unfair effort and expense.

19        14.    Since June 23, 2003 I have not come to California on company business or for any

20    other purpose.

21        15.    I have never personally used the California courts or any other service of that State.

22

23        I declare under penalty of perjury under the laws of the United States of America that the

24    foregoing is true and correct.

25    Executed on this _1_ day of ~~September~~ *OCTOBER* 2008, at Aberdeenshire, Scotland.

26

27

28        DAVID SMITH

2

**DECLARATION OF DAVID SMITH IN**
**SUPPORT OF PETITION TO QUASH CLAIM**

EXHIBIT "A"

American Arbitration Association
*Dispute Resolution Services Worldwide*

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| | | |
|---|---|---|
| Name of Respondent<br>Hydrospace Ltd. and David Smith | | Name of Representative (if known) |
| Address<br>National Hyberbaric Centre<br><br>123 Ashgrove Road West | | Name of Firm (if applicable) |
| | | Representative's Address |

| City<br>Aberdene AB16 5FA | State | Zip Code<br>Scotland AB51 7L | City | State | Zip Code |
|---|---|---|---|---|---|
| Phone No.<br>44-1224-666-313 | | Fax No.<br>44-1224-692-222 | Phone No. | | Fax No. |
| Email Address:<br>dsmith@hydrospace.co.uk | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated June 23, 2003 _____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

Beach of contract and other claims, see attached paper entitled "Kirby Morgan Dive Systems, Inc. Demand for Arbitration".

| Dollar Amount of Claim  $To be determined;<br><br>Estimated at $75,000.00 + | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest<br>☒ Arbitration Costs  ☒ Punitive/ Exemplary ☐ Other _____ |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $2,550.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
A single arbitrator, preferably a former federal judge, with experience in contractual agreements involving international parties and the law regarding trademarks, tradedress, trade secrets, unfair competition, and interference with business.

Hearing locale Los Angeles, California _____    (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract

| Estimated time needed for hearings overall:<br><br>_____ hours or  4 _____ days | Type of Business:  Claimant _Diving products innovator and manufacturing_<br><br>Respondent _Diving products distributor_ |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☐ Dallas, TX   ☐ East Providence, RI
☒ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)    Date:  9/4/08 | Name of Representative<br>Daniel M. Cislo and Kristin B. Kosinski |
|---|---|
| Name of Claimant<br>Kirby Morgan Dive Systems, Inc. | Name of Firm (if applicable)<br>Cislo & Thomas LLP |
| Address (to be used in connection with this case)<br>1430 Jason Way | Representative's Address<br>1333 2nd Street, Suite 500 |

| City<br>Santa Maria | State<br>CA | Zip Code<br>93455- | City<br>Santa Monica | State<br>CA | Zip Code<br>90401- |
|---|---|---|---|---|---|
| Phone No.<br>805-928-7772 x230 | | Fax No.<br>805-928-0342 | Phone No.<br>310-451-0647 | | Fax No.<br>310-394-4477 |
| Email Address:<br>cmorgan@kirbymorgan.com | | | Email Address:<br>dancislo@cislo.com, kkosinski@cislo.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

CISLO & THOMAS LLP
DANIEL M. CISLO (CA SBN 125,378)
KRISTIN B. KOSINSKI (CA SBN 237,555)
1333 2nd Street, Suite 500
Santa Monica, CA 90401
Telephone: (310) 451-0647
Facsimile: (310) 394-4477

Attorneys for Claimant
Kirby Morgan Dive Systems, Inc.

AMERICAN ARBITRATION ASSOCIATION

IN RE ARBITRATION OF:

| | |
|---|---|
| KIRBY MORGAN DIVE SYSTEMS, INC., ) | Case No. |
| ) | |
| Claimant, ) | **KIRBY MORGAN DIVE SYSTEMS,** |
| ) | **INC.'S DEMAND FOR** |
| vs. ) | **ARBITRATION** |
| ) | |
| HYDROSPACE, LTD. and DAVID SMITH, ) | |
| ) | |
| Respondents. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

## I.    PARTIES

1.    Claimant Kirby Morgan Dive Systems, Inc. ("Kirby Morgan") is a California corporation with its place of business at 1430 Jason Way, Santa Maria, California 93455.

2.    Upon information and belief, Respondent Hydrospace, Ltd. is an entity organized and existing under the laws of the United Kingdom having offices at National Hyperbaric Centre, 123 Ashgrove Road West, Aberdeen AB16 5FA, Scotland AB51 7lx.

3.    Upon information and belief, Respondent David Smith is an individual and Managing Director of Hydrospace, Ltd.

4

4.    Smith owns and controls Hydrospace. Smith, as owner and Managing Director of Hydrospace, has directed and directs all of the activities of Hydrospace that are referred to in this demand. Smith and Hydrospace are alter egos.

## II.    CONTRACT FOR ARBITRATION AND HEARING LOCALE

5.    An agreement dated June 23, 2003 between Kirby Morgan and Hydrospace and signed by Smith on its behalf calls for arbitration of any controversy, claim, or dispute arising out of or relating to the contract. (The agreement is referred to throughout as the "Contract" and is attached as Exhibit A.)

6.    The Contract calls for arbitration in Santa Barbara, California under the rules of the American Arbitration Association ("AAA"); however, there is no AAA Regional Office in Santa Barbara. The Los Angeles, California Regional Office serves portions of Southern California, including Santa Barbara; therefore, it has authority to address the instant Demand.

## III.    FACTUAL BACKGROUND

7.    Kirby Morgan principal Bev Morgan worked as a commercial diver for many years and also engaged in designing and manufacturing diving equipment. This led to the formation of Kirby Morgan in the early 1960's, and since then, through constant research and innovation, the company has developed the world's leading line of commercial diving helmets.

8.    Kirby Morgan began designing and developing commercial deep sea diving equipment in response to the needs of a growing industry that demanded rugged, easy to maintain equipment that was comfortable to use and provided protection for the diver. The company's SuperLite-17, also referred to as the SL 17, Helmet on sale since 1976 has become the standard in the commercial industry worldwide, and is also the standard of the U.S. Navy being given the Navy model designation MK-21 Helmet.

9.    The distinctive appearance of Kirby Morgan's diving helmets is widely

recognized by the trade and its customers to indicate the source of such diving equipment. In fact, users rely on the appearance of Kirby Morgan's helmets to know they are of high quality, and the ones with which they are familiar. Each helmet has a manual, checklist for use, spare parts and the like, thereby providing entities employing divers using Kirby Morgan equipment with a sense of safety and care that would otherwise be unavailable.

10.    Among the helmets currently being manufactured and sold by the company are the SuperLite 17 and 27, also referred to as the SL 17 and SL 27 series and the Kirby Morgan helmets designated KM 77, KM 57, KM 47, KM 37 all of which are shown below.



SuperLite®-27



SuperLite®-17B



Kirby Morgan® 77



Kirby Morgan® 57

3

6





**Kirby Morgan® 47**                          **Kirby Morgan® 27**

11.    Kirby Morgan also manufactures and sells a line of full face masks, under the registered trademark KMB-BANDMASK, including the KMB 18 and KMB 28 models, and the KIRBY MORGAN EXO-BR and M-48 SUPERMASK, as shown below.







**Kirby Morgan® Exo-BR**        **Kirby Morgan® M-48**        **Kirby Morgan® 18&28**

12.    The U.S. Patent and Trademark Office issued U.S. Registration Nos. 2,634,033, 2,670,929, 2,852,306, 2,801,683, and 2,803,929 covering Kirby Morgan's helmet designs (see

4

7

Exhibit B). Kirby Morgan also claims trademark rights in a flat diamond design mark used to identify its products under U.S. Registration No. 2,842,804 (see Exhibit B). The federal trademark registration for the flat diamond design makes clear that the color yellow inside the diamond is often a feature of the mark but when the diamond is stamped on metal portions of the product there is no color.

13.    Kirby Morgan owns several additional trademarks, service marks, trade names, and logos, including KIRBY MORGAN (U.S. Reg. No. 1,767,264), DSI (U.S. Reg. No. 1,794,714), EXO (U.S. Reg. No. 1,686,129), DIVING SYSTEMS INTERNATIONAL (both word and design marks) (U.S. Reg. Nos. 1,308,750 and 1,687,633), KMB-BANDMASK (U.S. Reg. No. 1,108,441), SUPERFLOW (U.S. Reg. No. 2,133,575), DECA (U.S. Reg. No. 2,328,591), SUPERLITE (both word and design marks) (U.S. Reg. No. 2,511,818), the color yellow diving helmets and masks, SUPERMASK (U.S. Reg. No. 2,828,695), and DIVE LAB (U.S. Reg. No. 2,673,623), REX (U.S. Reg. No. 2,786,778).

14.    Over the years Kirby Morgan has expended substantial sums of money and effort, and extensively advertised and successfully promoted its products and marks in numerous trade publications and at trade shows. Kirby Morgan has established a valuable business and substantial good will in the design of its products and its marks, and in the use of its products and marks in interstate commerce and throughout the world.

15.    Kirby Morgan has sold relatively large dollar volumes of its proprietary products worldwide and its products have met with wide and popular approval. As a result of Kirby Morgan's sales and promotion and the distinctive appearance of Kirby Morgan's products, Kirby Morgan's products have acquired a secondary meaning and have come to be known to the trade and to its customers throughout the United States, and the world, as identifying high quality products sold by Kirby Morgan.

16.    Kirby Morgan has registered the art work in its marks with the U.S. Copyright

Office, being awarded U.S. Registration Nos. VA0001190215, VA0001190217, and
VA0001190216 (see Exhibit C).

17.    Kirby Morgan also claims copyrights in its operations and maintenance manuals,
in English and other languages, awarded under U.S. Registration Nos. TX0005773303 and
TX0005773304 (see Exhibit C).

18.    Throughout its history, Kirby Morgan has strived to remain a small, highly
specialized company. The company is a diving equipment manufacturer not offering direct sales
to end users, but having an extensive world-wide dealer network (many of whom are authorized
repair facilities).

## IV.    THE DEALER CONTRACT

19.    On or about June 23, 2003, Kirby Morgan and Hydrospace entered into the
Contract (Exhibit A) for Hydrospace to be the non-exclusive sales distributor and representative
of Kirby Morgan's products in the United Kingdom.

20.    Smith signed the Contract on behalf of Hydrospace and has directed and directs
all of the activities required of Hydrospace under the Contract.

21.    Under paragraph 2 of the Contract, Hydrospace and Smith were to use their best
efforts to diligently and consistently advance the interests of Kirby Morgan in the United
Kingdom. These efforts included marketing and selling Kirby Morgan's products.

22.    The Contract required Hydrospace and Smith to use Kirby Morgan's trademarks
and copyrighted materials only as authorized and to maintain confidential information.

23.    In paragraph 6 of the Contract, Hydrospace and Smith acknowledged receipt of
confidential information and agreed for the term of the Contract and for twenty-four months
thereafter, that they would not participate, directly or indirectly, in the production, sale,

marketing, or servicing of any competing products.

24.    The Contract at paragraph 16 included an arbitration provision providing that any claim or dispute arising out of or relating to the Contract shall be finally settled by arbitration.

25.    The Contract included integration clauses that it was the entire agreement between the parties, and could only be amended by a writing signed by both parties.

26.    In any dispute arising out of the Contract, the prevailing party is entitled to reasonable attorneys' fees.

27.    The Contract also stated the failure of a party to insist upon strict adherence to any term would not be considered a waiver.

28.    The Contract and all conflicts or questions pertaining to the construction or enforcement of the Contract shall be determined under California law.

## V.    BREACH OF THE CONTRACT

29.    On information and belief, Hydrospace and Smith purchased the manufacturing rights to competing commercial diving helmets and a diving mask, including the Genesis and Proteus helmet lines and the Omega full face mask line of Submarine Systems International ("Submarine Systems") that are nearly identical to Kirby Morgan's products ("Accused Products"). Shown below are pictures of Kirby Morgan's products on the left next to pictures of the Accused Products on the right.

10



Kirby Morgan® KM 57 Helmet



Submarine Systems Genesis Helmet



Kirby Morgan® KM 57 Helmet



Submarine Systems Proteus Helmet



Kirby Morgan BandMask® 18&28



Submarine Systems Omega full face mask

30.     On or about July 24, 2008, Kirby Morgan terminated the Contract due to Hydrospace and Smith's inability to follow the agreed upon terms and their consequent breach.

31.     Upon information and belief, the helmet and face mask lines Hydrospace and Smith purchased the manufacture rights to are confusingly similar to Kirby Morgan's helmets and face masks. By way of example only, Kirby Morgan's helmets include a distinctive round front breathing system with minimal protrusion from the helmet, black brackets on either side of the breathing system, a unique shaped viewing window and placement of various features such as a steady flow valve and a auxiliary valve to the left and midway between the top and bottom of the viewing window, a communications mechanism attached under the steady flow valve to the front breathing system, and a push pin release system, all of which are identically found on the Genesis and Proteus helmets.

32.     Upon information and belief, Hydrospace and/or Smith are selling the Accused Products.

33.     As a result of Hydrospace and Smith's planned or actual advertising and sale of nearly identical and directly competing diving helmets and face masks, actual confusion is already or may occur among the trade and in the marketplace. Upon information and belief, sales are being, or will be, diverted from Kirby Morgan to Hydrospace and Smith.

34.     Following notice of its breach, Hydrospace continues to use the "Exo" "Superlite" and "Bandmask" registered marks in addition to the marks model-designating marks "EXO BR MASK" "SUPERLITE 17b" "KM 18b BANDMASK" "KM28 BANDMASK" "KM27 HELMET" "KM37 HELMET" and "SUPERMASK 48" (Exhibit D) without authorization.

35.     Commercial diving helmets available from legitimate competitors include the Desco DSL B-2 Deep Sea diving helmet, the Able Marine Advanced 2000 helmet, the Desco Free Flow Hat, and the Gorski G-2000 SS helmet as shown below.

9





**Desco DSL B-2 Deep Sea helmet**

**Able Marine Advanced 2000 helmet**





**Desco Free Flow Hat**

**Gorski Helmet G-2000 SS**

10

## VI.   ARBITRATION OF THE PRESENT DEMAND

### FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Respondents)

36.    Kirby Morgan, Hydrospace, and Smith entered into the Contract.

37.    Kirby Morgan performed and completed all conditions, covenants, and promises required of it in accordance with the terms and conditions of the Contract.

38.    The Contract required that Hydrospace and Smith use their best efforts to diligently and consistently advance the interests of Kirby Morgan, use Kirby Morgan's intellectual property only in the manner and for the purposes expressly authorized by Kirby Morgan, maintain proprietary and confidential information of Kirby Morgan, and not participate, during the agreement or for twenty-four months thereafter, in the design, manufacture, or production of any products or services competitive in any respect with the Kirby Morgan dive products distributed under the Contract.

39.    Hydrospace and Smith breached the Contract by failing to perform all conditions required by the Contract, the breach occurring in at least the following respects:

   a.   Competing with Kirby Morgan's products during and within two years of the Contract by the purchase of the competing dive products line,

   b.   Using Kirby Morgan's intellectual property in an unauthorized manner on its website following termination of the contract (Exhibit D),

   c.   Disclosing confidential information to others and using it inappropriately, and

   d.   Failing to follow Kirby Morgan's procedures including using its best

efforts to diligently and consistently advance the interests of Kirby Morgan.

40.    The unlawful conduct of Hydrospace and Smith has injured and will continue to injure Kirby Morgan and its business unless compensated in a final award by the arbitrator.

41.    Kirby Morgan was and is being damaged in an amount subject to proof in this proceeding.

## SECOND CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against All Respondents)

42.    Kirby Morgan, Hydrospace, and Smith entered into the Contract.

43.    Kirby Morgan performed and completed all conditions, covenants, and promises required of it in accordance with the terms and conditions of the Contract.

44.    The Contract required that Hydrospace and Smith use their best efforts to diligently and consistently advance the interests of Kirby Morgan, use Kirby Morgan's intellectual property only in the manner and for the purposes expressly authorized by Kirby Morgan, maintain proprietary and confidential information of Kirby Morgan, and not participate, during the agreement or for twenty-four months thereafter, in the design, manufacture, or production of any products or services competitive in any respect with the Kirby Morgan dive products distributed under the Contract.

45.    Hydrospace and Smith unfairly interfered with Kirby Morgan's right to receive the benefits of the Contract by purchasing the manufacturing rights to the diving helmets and masks produced by a third party, Submarine Systems, a direct competitor of Kirby Morgan.

46.    Hydrospace and Smith's purchase caused them to breach the Contract because Submarine Systems was not approved in writing by Kirby Morgan as an approved supplier and the purchase violated the contractual requirement to not participate in the manufacturing of any competitive products during the agreement or for twenty-four months thereafter.

47.    Kirby Morgan was harmed by Hydrospace and Smith's conduct in an amount subject to proof in this proceeding.

**THIRD CAUSE OF ACTION**

**Federal Trademark Infringement**

**15 U.S.C. §§ 1117, 1125**

**(Against All Respondents)**

48.    Kirby Morgan owns several trademarks, service marks, trade names, and logos, including federally registered marks and those protected under the common law by virtue of their use in commerce, including at least the following marks: a flat diamond design with the color yellow inside, EXO, KMB-BANDMASK, SUPERLITE, BANDMASK, EXO BR, SUPERLITE 17b, KM 18b BANDMASK, KM28 BANDMASK, KM27, KM37, SUPERMASK 48, SL, SL 17, SL 27, SUPERLITE 27, KM 57, and KM 77.

49.    Under the Contract, Hydrospace and Smith were authorized to use the trademarks, service marks, trade names, and logos only in the manner and for the purposes expressly authorized by Kirby Morgan in writing and only in compliance with the policies and procedures of Kirby Morgan governing the use of Kirby Morgan intellectual property.

50.    Upon termination of the Contract, Hydrospace and Smith must immediately cease to use and shall return to Kirby Morgan all Kirby Morgan trademarks, service marks, trade names, and logos.

13

51.     Hydrospace and Smith failed to cease using Kirby Morgan trademarks, service marks, trade names, and logos following termination of the contract on July 24, 2008, and such use is improper and infringes Kirby Morgan's trademark rights. Hydrospace and Smith continue to use the following "EXO" "SUPERLITE" "BANDMASK" "EXO BR" "SUPERLITE 17b" "KM 18b BANDMASK" "KM28 BANDMASK" "KM27" "KM37" and "SUPERMASK 48" protected marks, all of which are registered by the U.S. Trademark Office and/or protected under the common law (Exhibit D).

52.     Hydrospace and Smith's Genesis II Military Demand helmet line has a flat diamond design with the color yellow inside on the front of the top handle. The diamond is the same as Kirby Morgan's mark, such that consumers are likely to be confused as to the source, sponsorship or approval of Hydrospace and Smith's product line.

53.     Use of Kirby Morgan's marks that are exactly the same as its registered marks or marks in which it maintains common law rights creates a likelihood of confusion or mistake or deception among relevant customers and potential customers such that Hydrospace and Smith's acts constitute trademark infringement.

54.     Hydrospace and Smith failed to remove the marks and/or are using the marks on their new product lines with knowledge that confusion, mistake and deception would likely result and Hydrospace and Smith intended such consequences from their actions.

55.     As a result of each of the acts of infringement, Kirby Morgan has been damaged in an amount to be determined in this proceeding.

## FOURTH CAUSE OF ACTION
## Misappropriation of Trade Secrets
## Cal Civil Code §§ 3426 et seq.
## (Against All Defendants)

56.    Kirby Morgan owns confidential engineering and technical data, test and analysis data, marketing information, price lists, and customer information. All of this information may be designated as confidential and may only be disclosed or released by Hydrospace or Smith to a third party upon written consent of Kirby Morgan.

57.    The Kirby Morgan information designated as confidential had actual or potential independent economic value because it was secret.

58.    Kirby Morgan made reasonable efforts to keep the information secret.

59.    Hydrospace and Smith were given confidential trade secrets under the Contract and were required to maintain the information in confidence, however, upon information and belief they failed to do so, resulting in misappropriation of the trade secrets.

60.    Hydrospace and Smith's misappropriation caused Kirby Morgan harm in an amount to be determined during this arbitration.

## FIFTH CAUSE OF ACTION
## Federal Trade Dress Infringement
## 15 U.S.C. § 1125 (Lanham Act § 43(a))
## (Against All Respondents)

61.    The size, shape, arrangement, overall appearance, color and tone of the trade dress for Kirby Morgan's proprietary products are nonfunctional, fanciful, arbitrary, and inherently

18

distinctive and have acquired secondary meaning in the eyes of the relevant customers. Also, Kirby Morgan has registered the trade dress in its helmet designs under U.S. Reg. Nos. 2,634,033, 2,670,929, 2,852,306, 2,801,683, and 2,803,929.

62.    Hydrospace and Smith's Genesis and Proteus helmet lines and the Omega full face mask line are so highly similar in appearance to Kirby Morgan's products that the relevant customers are likely to be confused as to the source, sponsorship or approval of Hydrospace and Smith's dive product lines which infringe Kirby Morgan's trade dress.

63.    By reason of Hydrospace and Smith's each act of trade dress infringement, Kirby Morgan is entitled to recover all of Hydrospace and Smith's profits received or otherwise achieved, directly or indirectly, from their manufacture, importation, advertisement, and sale.

64.    Kirby Morgan was and is being damaged in an amount subject to proof in this proceeding.

## SIXTH CAUSE OF ACTION
### Copyright Infringement
### 17 U.S.C. §101 et seq. and Under the Universal Copyright Treaty
### (Against All Respondents)

65.    Kirby Morgan's copyrighted art work and materials ("works") created by Kirby Morgan contain a substantial amount of original material which constitutes copyrightable subject matter protected under the Copyright Act of 1976, 17 U.S.C. §101 *et seq.*

66.    Kirby Morgan has applied for, and received from, the United States Register of Copyrights, Certificates of Registration for several copyrighted works (Exhibit C).

67.    Kirby Morgan has at all times complied in all respects with the Copyright Act of

16

19

1976 and all other laws of the United States with regard to the works.

68.    Hydrospace and Smith have had access to these works under the Contract, know these works are copyrighted, and have used various copies constituting unauthorized copies of Kirby Morgan's proprietary works in violation of Kirby Morgan's exclusive rights under the Copyright Act of 1976, 17 U.S.C. § 106. Hydrospace and Smith's advertising and/or sales of substantially similar and/or identical copies of the works constitute copyright infringement in violation of Kirby Morgan's rights.

69.    Kirby Morgan was and is being damaged in an amount subject to proof in this proceeding.

## SEVENTH CAUSE OF ACTION
### Intentional Interference With Economic Relationships
### (Against All Respondents)

70.    Hydrospace and Smith intentionally interfered with an economic relationship between Kirby Morgan and its existing and prospective customers throughout the world including the United Kingdom that would have resulted in an economic benefit to Kirby Morgan.

71.    Kirby Morgan has existing and prospective business relations with customers throughout the world including the United Kingdom.

72.    Hydrospace and Smith knew of these relations because its existing and prospective customers in the United Kingdom are Kirby Morgan's customers.

73.    Hydrospace and Smith intended to disrupt the relationship by their purchase of the manufacturing rights of directly competing goods, including the Genesis and Proteus dive helmet lines and the Omega full face mask.

17

74.    Hydrospace and Smith engaged in wrongful conduct by contractually agreeing with Kirby Morgan that they would not manufacture products competitive in any respect to the dive products distributed under the Contract in consideration of the proprietary information transferred to Hydrospace and Smith under the Contract.

75.    Hydrospace and Smith disrupted the relationship with existing and prospective clients by both breaching the Contract  such that Hydrospace and Smith could no longer distribute Kirby Morgan products in the United Kingdom, and by seeking Kirby Morgan's existing and prospective customers by offering directly competing goods.

76.    Kirby Morgan was harmed.

77.    Hydrospace and Smith's wrongful conduct was a substantial factor in causing Kirby Morgan's harm and is being damaged in an amount subject to proof in this proceeding.


## EIGHTH CAUSE OF ACTION

### Negligent Interference With Prospective Economic Relations
### (Against All Respondents)

78.    Kirby Morgan has existing and prospective customers throughout the world including the United Kingdom, all of which Kirby Morgan derives or would derive some economic benefit.

79.    Hydrospace and Smith knew or should have known of this relationship by virtue of Hydrospace and Smith being former authorized sales distributors and representatives of Kirby Morgan products.

80.    Hydrospace and Smith knew that Kirby Morgan's relationship with its existing and prospective customers would be disrupted if Hydrospace and Smith failed to act with

18

21

reasonable care.

81.    Hydrospace and Smith failed to act with reasonable care and engaged in wrongful conduct through their purchase of the manufacturing rights of competing products, an act that was in direct violation of Hydrospace and Smith's contractual obligations with Kirby Morgan, and one in which would result in the sale of products in direct competition with Kirby Morgan's existing and prospective customers and the potential release of proprietary and confidential information owned by Kirby Morgan and given to Hydrospace and Smith under the Contract.

82.    The relationship between Kirby Morgan's existing and prospective customers was harmed because Hydrospace and Smith's wrongful conduct resulted in a breach of the Contract, thereby depriving existing and potential customers of access to Kirby Morgan products through Hydrospace and Smith.

83.    Hydrospace and Smith's wrongful conduct was a substantial factor in causing Kirby Morgan's harm and Kirby Morgan is being damaged in an amount subject to proof in this proceeding.

## NINTH CAUSE OF ACTION

### Unfair Competition

### Cal. Bus. & Prof. Code §§ 17200 et seq.

### (Against All Respondents)

84.    Hydrospace and Smith violate the California unfair competition laws in all of the aforementioned acts.

85.    Kirby Morgan contends that all of the acts noted undertaken by Hydrospace and Smith were intentionally and knowingly undertaken and were directed toward perpetrating a business competing unfairly with Kirby Morgan and were done with a willful disregard for the

19

rights of Kirby Morgan.

86.    As a direct and proximate result of the acts constituting unfair competition, Hydrospace and Smith have wrongfully taken Kirby Morgan's profits and the benefit of their creativity and investment of time, energy and money. Hydrospace and Smith should disgorge all profit from the sale of the Genesis and Proteus helmets, the Omega face mask, and related products, and further should be ordered to perform full restitution to Kirby Morgan.

87.    Kirby Morgan has suffered due to Hydrospace and Smith's unfair competition in an amount to be determined during this arbitration.

WHEREFORE, Kirby Morgan respectfully requests an award in arbitration and relief in its favor and against Hydrospace and Smith as follows:

A.  That Hydrospace and Smith have breached the Contract and the implied covenant of good faith and fair dealing;

B.  That Hydrospace and Smith misappropriated trade secrets and infringed Kirby Morgan's trademarks, trade dress, and copyrights;

C.  That Hydrospace and Smith have tortiously interfered with Kirby Morgan's economic advantage and unfairly competed;

D.  That Kirby Morgan be awarded damages to compensate for the breach of contract, breach of the implied covenant of good faith and fair dealing, federal trademark infringement, misappropriation of trade secrets, federal trade dress infringement, copyright infringement, intentional interference with economic relationships, negligent interference with prospective economic advantage, and unfair competition;

E.  That Kirby Morgan be awarded other and further relief as permitted by law and/or

20

23

equity; and

F.  That Kirby Morgan be awarded all costs and expenses of the instant arbitration, including reasonable attorneys' fees, together with such other and further relief as is deemed to be just.

Dated:  9-4-08

Respectfully submitted,

KIRBY MORGAN DIVE SYSTEMS, INC.

By: _____

Daniel M. Cislo
Kristin B. Kosinski
CISLO & THOMAS LLP
1333 2nd Street, Suite 500
Santa Monica, CA 90401

Attorneys for Claimant
KIRBY MORGAN DIVE SYSTEMS, INC.

T:\08-21581\Demand for Arbitration v.3.DOC

21

24

EXHIBIT "B"

## DEALER AGREEMENT

THIS DEALER AGREEMENT is made effective as of June 23, 2003 by and between:

**Kirby Morgan Dive Systems, Inc.**
a California corporation
425 Garden Street
Santa Barbara, California 93101
**("KMDSI")**

and

**HYDROSPACE LTD.**
Manor House Buildings
Midmar, Inverurie
Aberdeenshire   Scotland UK AB51 7LX
**("DEALER")**

with reference to the following facts:

A.    KMDSI manufactures the products listed in Exhibit A (the "Products"). Products include spare parts and replacements.

B.    DEALER desires to be the non-exclusive sales distributor and representative of Products in the United Kingdom (the "Territory")  in accordance with the terms of this Agreement.

C.    Each of the parties warrants that it has the legal capacity and authority to enter into this Agreement; that it does not need the consent or approval of any third party, court or governmental agency to enter into this Agreement; and that entering into this Agreement will not cause such party to be in breach of any other obligation.

In consideration of the foregoing facts and mutual promises herein set forth, the parties hereto hereby agree as follows:

1.    Appointment of DEALER

Subject to and on the terms and conditions of this Agreement, KMDSI appoints DEALER as the non-exclusive independent dealer and sales representative of Products in the Territory, to promote, market, sell, and service (collectively referred to as "market") all of said Products.  KMDSI reserves the right from time to time to add Products to and withdraw any Product from distribution to DEALER.

2.    DEALER's Duties

DEALER shall use its best efforts to diligently and consistently advance the interests of KMDSI, which efforts shall include (without limitation) the following:

(a)  Market all Products in the Territory.  In this connection, DEALER may sell from the Territory to any purchaser in any area throughout the world, provided such sales are made exclusively to end users of the Products.  DEALER further agrees to promote, sell and service Products in order to achieve sales objectives and market penetration satisfactory to KMDSI, and otherwise to continuously offer, aggressively merchandise, efficiently display and demonstrate Products.

(b)  DEALER will sell genuine KMDSI Products only to end users of such Products.  Unless otherwise expressly authorized in writing by KMDSI, DEALER may not supply KMDSI Products, KMDSI price lists, KMDSI product descriptions and specifications, or KMDSI catalogs, photographs or other promotional materials to any other DEALER or reseller, group, organization, individual or other customer whose purpose is to resell the products.  Dealer shall refrain from posting any of KMDSI's prices on the Internet or any similar electronic media.  Dealer agrees to supply KMDSI a price list showing the prices they charge for KMDSI products at least once a year.  DEALER's violation of any of these covenants shall be deemed to be a material breach of this Agreement.

(c)  Employ, train in the proper application and sale of the Products, and keep employed such sales personnel as are necessary to inform end users in the uses and applications of the Product.  Without limiting the foregoing, DEALER shall at all times keep its sales and service staff informed regarding the proper use of the Products, and will train its personnel with all materials published by KMDSI for the proper use of the Products.  In promoting the sale of the Products, DEALER will exercise its informed judgment as to which Products will best serve its customers' needs.  If DEALER, based upon its experience and knowledge, is unable to exercise such informed judgment, it will consult with KMDSI before selling any Products.

(d)  Provide to KMDSI promptly and accurately market intelligence reports relating to present and projected requirements for new products, and details of customers' requirements for all Products;

(e)  Assist KMDSI to obtain such regulatory certification and documents relating to customers as required by regulatory authorities in the Territory;

(f)  Carry a representative and adequate stock of Products suitable for efficient promotion, sale and delivery of the Products, and to satisfy customer service requirements.  DEALER agrees to promptly respond to all customer complaints concerning the Products, and to consult with KMDSI where required to resolve customer complaints or problems.

(g)  Unless KMDSI has approved another supplier in writing, DEALER will sell only original (Genuine Kirby Morgan) KMDSI manufactured or supplied spare parts for any of the Products made by KMDSI.

(h)  When delivering Products to its customers, DEALER shall deliver warranty cards, operations and maintenance manuals and any instructional and promotional information provided by KMDSI, and otherwise comply with any and all applicable laws and regulations pertaining to product safety.  DEALER agrees not to alter

the original packaging of any Complete Unit, or identification, manufacture, part number or any other information on the Product. Dealer also agrees not to prepare or give out any instructions or manuals on KMDSI products without prior written authorization by KMDSI.

    (j)   Minimum retail price policy (MRPP)

- In the event that any dealer located in the continental United States sells Kirby Morgan Dive Systems Inc. (KMDSI) products below the minimum retail price, KMDSI will terminate that dealer's authorization for the product, category or group in question, or at KMDSI's discretion, may terminate relations entirely for violation of the policy.

- The minimum retail price for each product is ninety (90) percent of the manufacturer's suggested retail price, as shown in the most current KMDSI Retail Price List.

- Any "bait and switch" tactics used to sell other merchandise at further discounts are not permitted.

- Auctions and any other selling activity that allow consumers to make an offer on a KMDSI product that is below the minimum retail price, is a violation of the policy and therefore not permitted.

- KMDSI will inform dealers if a product is to be discontinued; a discontinued item is not covered by the minimum retail price policy.

Enforcement of policy

Out of fairness and respect to all dealers, Kirby Morgan Dive Systems Inc. is committed to enforcing the minimum retail price policy in its entirety with absolutely no exceptions. KMDSI is responsible for enforcing this policy, and requests that you refrain from communicating information concerning the retail pricing of other KMDSI dealers. All enforcement decisions, and any modifications to the policy, will be made solely by Kirby Morgan Dive Systems Inc. If further clarification is required please contact the management of KMDSI.

3.   KMDSI's Duties

KMDSI shall render the following assistance to DEALER which efforts shall include the following:

    (a)  As long as DEALER is not in material breach of this Agreement (including the full and punctual payment of all KMDSI invoices), KMDSI agrees to accept orders for the products placed by DEALER upon the terms and conditions set forth herein, and at prices and terms specified from time to time by KMDSI on its then current price list and terms and conditions of sale.

(b)  KMDSI shall furnish on a timely basis any promotional literature and materials in reasonable quantities and any other data to DEALER which is required to be furnished to DEALER hereunder.

(c)  KMDSI shall use its best efforts to ship all of DEALER's orders for Product(s) promptly after receipt and approval of same by KMDSI.  No order shall be binding upon KMDSI, however, unless and until accepted by KMDSI in writing. Except for the refund of any prepayment for the unshipped or delayed Products, KMDSI shall not be liable for delays or failure to ship the Products, regardless of the reason for such delay or failure.

(d)  During the term of this Agreement, KMDSI will provide to DEALER all information concerning the Product(s) that may affect DEALER's business as soon as it is available and in any event before public announcement, provided that in relation to any Product discontinuation, all orders from DEALER for Products accepted by KMDSI prior to any such notice of discontinuation shall be performed by KMDSI.  This information will include, but not be limited to all improvements, updates, enhancements and modifications to the Product(s) and the introduction of any new Product(s).

(e)  KMDSI shall from time to time, provide training to DEALER's appropriate employees in the safe and proper use and maintenance of the Products. KMDSI may require DEALER to pay some or all of KMDSI's expenses relating to providing training to DEALER or DEALER's employees.

4.    Orders. Payment.

4.1    Each order placed by DEALER for the Products in accordance with Paragraph 3(a) shall be deemed to incorporate all of the terms and conditions of this Agreement.  No order submitted shall be deemed complete unless all of the information called for by KMDSI is provided by DEALER and shall include such pertinent information such as: purchase order number, quantity, material and specifications (if applicable), method of shipping and method of payment.  No modification of the subject matter or terms and conditions of any order shall be made unless consented to in writing by both parties.

4.2    KMDSI shall not be obligated to accept any order which contains any terms and conditions in addition to or inconsistent with the terms and conditions of this Agreement.  Any order not rejected within a five (5)-day period shall be deemed accepted by KMDSI.

4.3    All sales hereunder shall be at prices and upon terms established by KMDSI as shown in Exhibit A.  KMDSI shall have the right, in its sole discretion, to modify Exhibit A at any time, upon giving DEALER at least thirty (30) days' advanced written notice thereof.

4.4    All transactions, quotations, and payments under this Agreement shall be made in US Dollars (USD) unless otherwise agreed in writing.  No variation or change in exchange rates between USD and DEALER's national currency unit or the euro (if applicable) shall constitute an event of commercial impossibility, frustration of purpose, or *force majeure*.

4.5    Unless otherwise specified in Exhibit A, all risk of loss, damage, or delay in transit for Products sold and delivered to DEALER hereunder shall pass to DEALER upon delivery to a carrier or forwarding agent for shipment to DEALER; provided, however, that KMDSI retains title to and right of repossession of such Products until it has received payment in full for same.

5.    KMDSI's Intellectual Property (Trademarks, Trade Names, Copyrighted and Proprietary Materials).

  5.1    KMDSI's Intellectual Property. KMDSI Intellectual Property means:

    5.1.1    Present and future trademarks, service marks, trade names, logos and patents of KMDSI or its affiliates, whether registered or not, all original work in various stages of completion, including final copyrighted works, and all designs, drawings, specifications, models, data and mock-ups regarding such marks, names, patents and works, whether or not registered, copyrighted or patented with the specific governmental agency involved ("Marks/Names/Patents/Works"); and

    5.1.2    All KMDSI price lists, product descriptions and specifications, KMDSI Products, part numbers, catalogues, manuals, photographs, posters, promotional materials and copyrighted materials that KMDSI treats as proprietary, whether or not designated as confidential, or that KMDSI designates as confidential, whether or not treated as proprietary ("Proprietary/Confidential Information").

  5.2    KMDSI Trademarks. KMDSI trademarks include: KIRBY MORGAN, DSI, EXO, DIVING SYSTEMS INTERNATIONAL (both word mark and design mark), KMB-BANDMASK, SUPERFLOW, DECA, SUPERLITE (both word mark and design mark), the color yellow on diving helmets and masks, BANDMASK AND KMB.

  5.3    DEALER'S Use of KMDSI Intellectual Property. KMDSI trademarks and trade names and all other KMDSI Intellectual Property may be used by DEALER only in the manner and for the purposes expressly authorized by KMDSI in writing and only in compliance with the policies and procedures of KMDSI governing the use of KMDSI Intellectual Property. DEALER agrees not to use KMDSI Intellectual Property in any manner without the express written authorization from KMDSI and in accordance with this Agreement and with KMDSI policies and procedures. DEALER understands and acknowledges that KMDSI policies and procedures with respect to KMDSI Intellectual Property may be modified from time to time at any time at the sole discretion of KMDSI. DEALER further agrees that DEALER immediately will cease to use and shall return to KMDSI all KMDSI Intellectual Property upon termination of this Agreement.

Ownership of KMDSI Intellectual Property. DEALER acknowledges and agrees that it does not have, nor will it obtain by this Agreement, any proprietary interest in any such KMDSI Intellectual Property. DEALER further agrees not to use any such KMDSI Intellectual Property or anything confusingly similar thereto or a colorable imitation thereof, as part of its corporate or business name, trademark, service mark, trade dress,

domain name or e-mail address. DEALER further acknowledges KMDSI's ownership in and to KMDSI Intellectual Property, the validity thereof, and to the extent permitted by law, shall not contest same in connection with any actions brought by KMDSI under this Agreement. Notwithstanding any other provision of this Agreement, this Section 5.4 shall survive the termination of this Agreement.

6.    Proprietary and Confidential Information.

6.1    From time to time, KMDSI may make available to DEALER certain information including, but not limited to, engineering and technical data, test and analysis data, marketing information, price lists, and customer information. Information which is designated as confidential by KMDSI shall not be disclosed or released by DEALER to any third party without prior written consent of KMDSI. Under no circumstances shall DEALER acquire any right to use such information except in the performance of its duties hereunder, nor may it disclose or use such information except in accordance with the terms hereof. DEALER shall take such steps, including steps reasonably requested by KMDSI, as may be necessary or advisable to assure the secrecy of all confidential data transmitted by KMDSI to DEALER. From and after the termination of this Agreement, DEALER shall refrain from the use of such information for any purpose whatsoever, and all such confidential data and copies thereof shall be immediately returned to KMDSI by DEALER.

6.2    In consideration of the proprietary information to be transferred to DEALER in pursuance of this Agreement, DEALER agrees that for the term of this Agreement and twenty-four (24) months thereafter, DEALER shall not participate, directly or indirectly, in the design, manufacturing, or production of any products or services competitive in any respect with the Products distributed now or hereafter under this Agreement.

6.3    DEALER acknowledges that damages ensuing a breach of this Paragraph 6 would be difficult or impossible to ascertain and that without limiting its right to recover such damages for a breach of this Paragraph 6, KMDSI may apply to any court having jurisdiction to enjoin such breach or threatened breach.

7.    Warranties.

KMDSI makes no representations or warranties with respect to the Product(s) to DEALER. KMDSI's representations and warranties are made solely to the purchasers of Products in its standard warranty as set forth in Exhibit B hereto. DEALER has no authority to make or vary any representation or warranty with respect to Products other than to provide KMDSI's standard warranty herein.

8.    Term and Termination.

8.1    This Agreement shall become effective on the date of its execution by KMDSI and unless otherwise terminated as provided in Paragraph 9 of this Agreement, shall continue in full force and effect for one (1) year. Thereafter, this Agreement shall automatically be renewed every year and may be terminated thereafter by either party upon thirty (30) days prior written notice of termination or as otherwise provided in

paragraph 9 of this agreement. As used herein, "term" shall include renewal terms. This Agreement may be terminated with or without cause.

8.2    In the event of any termination of this Agreement, neither party shall be entitled to any compensation, damages or payments for loss of goodwill, and (except as provided for in Paragraph 9 hereof) all payments normally due to KMDSI from DEALER on account of sales to customers shall be paid in full immediately upon termination or expiration of this Agreement.

8.3    All orders accepted by KMDSI at any time prior to the effective date of termination of this Agreement shall survive such termination and shall be governed by all of the terms and conditions of this Agreement.

9.    Default and Termination.

9.1    Termination for Default. The occurrence of any of the following shall constitute a default under this Agreement:

(a)    A material breach of either party of its respective obligations under this Agreement, which breach shall remain uncured for thirty (30) days from receipt of written notice from the non-breaching party;

(b)    The filing by or against either party of a proceeding under any bankruptcy or similar law, unless such proceeding is dismissed within thirty (30) days from the date of filing; the making by either party of any assignment for the benefit of creditors; the filing by or against either party of a proceeding for dissolution or liquidation, unless such proceeding is dismissed within thirty (30) days from the date of filing; the appointment of or the application for the appointment of a receiver, trustee or custodian for all or part of the assets of either party, unless such appointment or application is revoked or dismissed within thirty (30) days from the date thereof; the attempt by either party to make any adjustment, settlement or extension of its debts with its creditors generally; the judicially declared insolvency of either party; the good faith filing or recording of any lien or the issuance or the obtaining of a levy of execution upon or against any asset of either party, unless such lien or levy of execution is dissolved within thirty (30) days from the date of its filing or recordation; or

(c)    The unconsented to assignment of its rights and obligations by either party.

9.2    If any default occurs, the non-defaulting party, in its sole discretion, may immediately terminate this Agreement (with the exception of Section 5.4 above) upon written notice to the defaulting party. The effective termination date in the event of default shall be the date of the event of default or, if a cure period is prescribed herein, the day following the last day of such cure period.

9.3    Any and all rights accrued hereunder as of the effective date of termination shall survive such termination. Without limiting the foregoing, all accepted orders for Products shall be shipped to DEALER as soon as practicable, but KMDSI shall not be obligated to deliver any Products to DEALER after the effective termination date, and within sixty (60) days thereafter, KMDSI shall repurchase from DEALER any

merchantable inventory of Products and spare parts on hand at DEALER at KMDSI's original invoice price to DEALER less 10%.

10. Excused Non-Performance

Neither party shall be deemed to be in default of, or to have breached any provision of this Agreement, solely as a result of any delay, failure in performance or interruption of service resulting directly or indirectly from acts of God, acts of civil or military authority, civil disturbance, war, strikes or other labor disputes, fires, transportation contingencies, material or labor shortages, laws, regulations, acts or orders of any government or agency of any government official, or any other occurrence beyond the reasonable control of either party. It is expressly understood, however, that the obligations of either party to perform under the terms of this Agreement shall resume after the passing of, or normalization of, any of the eventualities described above, provided that the occurrence of any such eventuality shall in no event extend the term of this Agreement.

11. Notification of Infringement

DEALER shall notify KMDSI in writing of the institution of any claim against DEALER as the result of DEALER's purchase and resale of the Products arising or alleged to arise from patent, trademark, or copyright infringement; unfair competition; the failure or alleged failure of the Products to comply with specifications or with any express or implied warranties of KMDSI; the alleged violation by such Products or in its manufacture or sale of any statute, ordinance, or administrative order, rule, or regulation; defective design; defective warnings or instructions; or any other claim (collectively "Claims"); within twenty four (24) hours from DEALER's receipt of such notice or knowledge thereof, and shall lend all reasonable assistance in the defense of or compromise of any Claim. Dealer shall not release any notices to the public or any other entities regarding KMDSI products without first being reviewed by, and authorized in writing by KMDSI. This includes Safety and/or Caution notices or any notice prompted by a claim as noted in the above paragraph.

12. Indemnity

Each party agrees to indemnify, defend and hold harmless the other and its respective officers, directors, shareholders, employees and agents, from and against any and all claims, suits, causes of action, liabilities, defaults, obligations, injuries, losses or damages, including reasonable attorneys' fees and costs arising from or relating to, either directly or indirectly, the indemnifying party's breach of any of its covenants or obligations hereunder or its negligent acts or omissions in connection herewith.

13.  Compliance with Laws.

In performing their respective duties hereunder, the parties shall comply with all applicable laws and regulations, and shall cooperate with one another at all times in connection with their legal and regulatory obligations.  Without limiting the generality of the foregoing, each of the parties warrants and agrees that:

(a)  it shall observe and comply with any and all terms and conditions attending the export and re-export of Products to and from the Territory, and shall promptly advise the other of any suspected or actual violation of such terms or conditions in connection with its activities under this Agreement; and

(b)  it shall obtain and maintain in force during the term hereof, or any renewals hereof, any license or permits required by cognizable government authorities of the Territory for the performance of its duties hereunder.

14.  Relationship of the Parties.

The parties are independent contractors under this Agreement and are not joint venturers, partners, or agents of each other, and are not authorized to act in such other capacities. No third-party beneficiary rights are intended to be created.

15.  Governing Law.

This Agreement has been accepted and is to be performed in part in the State of California.  Any and all conflicts or questions pertaining to the construction or enforcement of this Agreement (whether in arbitration, conciliation or judicial proceedings or otherwise) shall be determined by reference to the laws of said State (excluding its conflicts of law rules).  The parties expressly waive the application of the Convention for the International Sale of Goods.

16.  Arbitration.

Any controversy, claim or dispute arising out of or relating to this Agreement (except at the option of either party for any application for injunctive relief within the scope of Paragraph 6 of this Agreement) shall be finally settled by conciliation or arbitration at Santa Barbara, California under the rules of the American Arbitration Association and judgment upon the award rendered may be entered in any court having jurisdiction.  In this regard, the parties submit to the personal subject matter jurisdiction of the State of California. **EACH PARTY HERETO KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY OF ANY DISPUTE RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION SHALL BE ADJUDICATED BY AN ARBITRATOR AND WITHOUT A JURY.**

17. Attorneys' Fees.

Should any party hereto retain counsel for the purpose of enforcing, or preventing the breach of, any provision hereof, including but not limited to, the institution of any action or proceeding to enforce any provision hereof, or for damages for any alleged breach of any provision hereof, or for a declaration of such party's rights or obligations hereunder, then, whether such matter is settled by conciliation, arbitration, or judicial determination, the prevailing party shall be entitled to be reimbursed by the losing party (as denominated by the arbitrator or judge) for all costs and expenses incurred thereby, including, but not limited to, reasonable attorneys' fees for the services rendered to the prevailing party.

18. General Terms.

18.1  This Agreement is the final and exclusive statement of all understandings between the parties to the subject matter or to the transactions contemplated under this Agreement.  There are no other agreements, representations, or warranties, or conditions other than those expressly set forth in this Agreement.

18.2  No modifications or amendments to this Agreement shall be effective unless made in writing and signed by both parties.

18.3  No waiver of any provision of this Agreement or of any rights or obligations of either party under this Agreement shall be effective unless in writing and signed by the party or parties waiving compliance and any such modification shall be effective only in the specific instance and for the specific purpose stated herein.

18.4  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

18.5  If any provisions of this Agreement are found invalid or unenforceable pursuant to judicial decree, the remainder of this Agreement shall remain valid and enforceable during and according to its terms.

18.6  The obligations of DEALER hereunder may not be assigned without the prior written consent of KMDSI.

19. Notices.

Any notices to be given in writing under this Agreement shall be given by First Class Mail postage prepaid to the parties at the address shown in the preamble to the Agreement or by telecopy facsimile transmission as follows:

If to KMDSI, to:  Kirby Morgan Dive Systems, Inc.
        425 Garden Street
        Santa Barbara, California 93101
        Facsimile:  805-966-5761

If to DEALER, to: Hydrospace Ltd.
        Manor House Buildings
        Midmar, Inverurie
        Aberdeenshire, Scotland UK AB51 7LX
        Facsimile: 44-1330-860-462

In witness whereof the parties hereto have signed this Agreement on the date first appearing above.

KIRBY MORGAN DIVE SYSTEMS, INC.   HYDROSPACE LTD.

Sign: _____   Sign: _____

Name: _STEVE KUSHNER_   Name: _DAVID SMITH_

Title: _PRESIDENT_   Title: _MANAGING DIRECTOR_

Date: _6/9/03_   Date: _16/6/03_

35

Exhibit A

Prices and Products

**Confidential Price Schedule**

All prices in this Exhibit are EX WORKS (INCO Terms 1990). DEALER or any other buyer authorized to purchase from KMDSI directly in accordance with the terms of this Agreement is responsible for all additional costs including, but not limited to, freight, insurance, handling, shipping documentation fees, duties and customs charges, and local cartage.

| Pricing Ex Works (U.S. Dollars) | Discount from Retail |
|---|---|
| Manuals, 100 Series | 25% |
| EXO Product Line, Manifold Block Assemblies | 30% |
| 1st & 2nd Stage Scuba Regulators, Complete | 50% |
| Dive Control Systems | 25% |
| Commercial Helmets, Bandmasks, Parts & Accessories, 500 Series | 25% |
| Clothing Line, 600 Series (through 600-699) | 30% |
| Custom Wetsuits & Wetsuit Products | Call for Quote |

**EXHIBIT B**

Standard Product Warranty

KMDSI warrants every new mask, helmet, SCUBA regulator or diving control system ("DCS") (each, a "Product") to be free from defects in workmanship for a period of ninety (90) days from the date of purchase from a KMDSI authorized dealer. This warranty covers all metal, fiberglass, and plastic parts, but does NOT cover rubber parts, communications components, or head cushions.

Any defect of the product in workmanship or material covered by this warranty discovered within ninety (90) days from the date of purchase must be promptly communicated in writing to the nearest authorized KMDSI dealer or (if no such dealer in the buyer's country) contact KMDSI number directly at (805) 965-8538. No Product returns will be accepted by KMDSI without a returned merchandise number (RMA) authorization from KMDSI. Upon receipt of the RMA from KMDSI, the buyer should return the defective Product or part, freight prepaid, to an authorized KMDSI dealer or the KMDSI plant, as directed by the RMA. KMDSI will repair or replace the Product at no charge, within a reasonable time, as it deems necessary.

This warranty is null and void if:

1)  The Product is not registered with KMDSI within ten (10) days of purchase, or

2)  The Product has not been properly serviced and/or maintained according to KMDSI factory recommended procedures described in the manual or Product updates have not been performed as recommended by KMDSI, or

3)  Unauthorized attachments or modifications have been made to the Product, or

4)  The Product has been used for purposes other than those for which it was designed, or otherwise has been abused, misused, or subjected to unusual conditions, or the Product's intended service has been exceeded.

**EXCEPT AS SPECIFICALLY PROVIDED HEREIN, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES FOR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THE PRODUCT COVERED BY THIS WARRANTY IS MARKETED AND SOLD BY KMDSI SOLELY FOR COMMERCIAL OR INDUSTRIAL USE AND IS NOT A CONSUMER PRODUCT INTENDED FOR PERSONAL, FAMILY, OR HOUSEHOLD USE.**

In purchasing any Product subject to this warranty, the buyer agrees that its sole and exclusive remedy and KMDSI's entire obligation in contract, tort, or otherwise under this contract will be repair or replacement at KMDSI's option of the Product or any parts which KMDSI determines during the applicable warranty period are defective in workmanship or material covered by this warranty. All exchanged parts are the property of KMDSI. The buyer's exclusive remedy and the KMDSI's entire liability in contract, tort, or otherwise is the payment

by KMDSI of the buyer's actual damages up to but not to exceed the amount paid by the buyer for the Product.

In no event shall KMDSI be liable to the buyer for indirect, special, incidental or consequential damages (including, but not limited to, damages for lost profits, lost sales, loss of business opportunity, or for injury to persons or property arising out of the use of the Products). Any claim or action for breach of warranty must be commenced within one year following delivery of the Product to the buyer.

Buyer acknowledges that this warranty is the sole and exclusive warranty of the Product and that it supersedes any and all oral or written representations and undertakings between KMDSI, its dealers, and the buyer relating to the Products. This warranty allocates the risks of product failure between KMDSI and the buyer, which allocation is recognized by both parties and is reflected in the price of the goods. The buyer acknowledges that it has read this agreement, understands it, and is bound by its terms.